## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

DAYS INN WORLDWIDE, INC., a
Delaware Corporation,

          *Plaintiff*,

    v.

SHRI GANESAI LLC, a Missouri
Limited Liability Company; and
MAYURI PATEL, an individual,

          *Defendants*.

No. 22-cv-01008 (MEF)(AME)

**OPINION and ORDER**

## Table of Contents

I.    **Background**
    **A.**    **The Evidence**
    **B.**    **Procedural History**
    **C.**    **The Motion**
II.    **Breach of Contract**
    **A.**    **"Continuously and Diligently"**
    **B.**    **The Counterargument**
        **1.**    **Arson**
        **2.**    **The Franchise Agreement**
    **C.**    **Conclusion**
III.  **Trademark**
    **A.**    **The Statutes**
    **B.**    **The Cases**
IV.  **Conclusion**

\*    \*    \*

There was a fire at a hotel, and it closed.

Citing unpaid fees that were due under the franchise agreement, the hotel franchisor sued the hotel operator and its guarantor, mainly for breach of the agreement.

The franchisor has now moved for partial summary judgment.

The motion is denied.

I.    **Background**

    A.    **The Evidence**

The undisputed evidence, as relevant for now, is set out here.

In 2017, a hotel franchisor[1] and a hotel operator[2] entered into an agreement ("Franchise Agreement"[3]).

Under the Franchise Agreement, the hotel operator had to pay certain monthly fees.  See Franchise Agreement § 7.[4]

In 2019, there was a fire at the hotel.  See Defendants' Statement of Material Facts (ECF 63-2) ¶ 80; Plaintiff's Response to Defendants' Statement of Material Facts ("Plaintiff's Response") (ECF 65-2) ¶ 80.

It knocked the hotel out of operation.  See Defendants' Statement of Material Facts ¶ 81; Plaintiff's Response ¶ 81. And it has not reopened.  See Defendants' Statement of Material Facts ¶ 98; Plaintiff's Response ¶ 98.

---

[1]  Days Inn Worldwide, Inc.

[2]  Shri Ganesai LLC.

[3]  The Franchise Agreement is Exhibit A to the Affidavit of Kendra Mallet in Support of Plaintiff's Motion for Summary Judgment Against Defendants ("Mallet Affidavit") (ECF 58-6).

[4]  There was also a guaranty.  Under the guaranty, if the hotel operator did not fulfill certain obligations under the Franchise Agreement, a particular guarantor had to step in.  See Mallet Affidavit, Exhibit C at 1.  The guarantor: Mayuri Patel.

After the 2019 fire, the hotel operator did not pay the monthly fees laid out in the Franchise Agreement.  See, e.g., Mallet Affidavit, Exhibit D.[5]

And in 2022, the hotel franchisor terminated the Agreement.  See id., Exhibit L.

### B.   Procedural History

After the events described above, the hotel franchisor sued the hotel operator and the guarantor.

From here, the franchisor is called "the Plaintiff." Collectively, the operator and the guarantor are called "the Defendants."

The main gist of the lawsuit: breach of contract, by the hotel operator for not paying fees due under the Franchise Agreement, see Amended Complaint ("Complaint") (ECF 31) ¶¶ 59-64, 69-72, and by the guarantor for not stepping in to make up the unpaid fees.  See id. ¶¶ 77-80.

Also in the lawsuit: intellectual property claims, because after the 2019 fire left the hotel inoperable, the hotel operator kept the old hotel sign up through to 2023, and that sign displayed the Plaintiff's trademark.  See id. ¶¶ 44-54.

### C.   The Motion

The Plaintiff now moves for summary judgment as to four counts of its Complaint.  See Motion for Summary Judgment (ECF 58-7) at 1-2.

These are: trademark infringement and dilution (Count I), breach of contract as to the Franchise Agreement (Counts III and V), and breach of contract as to the guaranty (Count VII).[6]

The motion is before the Court.

---

[5]  And note: the operator was delinquent on fees before the fire. See Mallet Affidavit, Exhibit D; Couch Certification (ECF 58-5), Exhibit B, at 44:11-24.

[6]  Counts I, III, and V run against the hotel operator.  Count VII is against the guarantor.

Part II takes up the various breach of contract claims.  Part III considers the trademark claims.[7]

## II.  **Breach of Contract**

The Plaintiff argues that it is entitled to summary judgment on its Count III claim that the hotel operator breached the Franchise Agreement by not paying recurring fees that were due under the Agreement.  See Motion for Summary Judgment at 5-9.

That argument is not persuasive.  This Part explains why.

\*     \*     \*

Under New Jersey law,[8] the elements of a claim for breach of contract are "[1] a valid contract between the parties, [2] the opposing party's failure to perform a defined obligation under the contract, and [3] a breach causing the claimant to sustain[] damages."  Nelson v. Elizabeth Bd. of Educ., 466 N.J. Super. 325, 343 (App. Div. 2021) (cleaned up); see also Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016).

---

[7] The everyday rules for assessing a summary judgment motion apply here.  "[A] district court may not make credibility determinations or engage in any weighing of the evidence[.]" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004). And a district court must "view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor."  Canada v. Samuel Grossi & Sons, Inc., 49 F.4th 340, 345 (3d Cir. 2022) (cleaned up); accord Tolan v. Cotton, 572 U.S. 650, 660 (2014).  To win on summary judgment, a party must show two things: first, "that there is no genuine dispute as to any material fact"; and second, that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Dupree v. Younger, 598 U.S. 729, 737 (2023); Cellco P'ship v. White Deer Twp. Zoning Hearing Bd., 74 F.4th 96, 100 (3d Cir. 2023).

[8] This is a diversity case, and the Franchise Agreement says that it is controlled by New Jersey law.  See Franchise Agreement § 17.6.1.  Therefore, New Jersey law controls, absent certain exceptional circumstances that no one argues are in play here.  See La Quinta Franchising LLC v. Alsbury Hosp., Inc., 2025 WL 1837667 (D.N.J. July 3, 2025); see generally Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941).

Move quickly through the first element and the third.

As to the first, no one argues that the Franchise Agreement was anything other than a "valid contract."

And as to the third element, if the hotel operator did not pay fees it owed under the Franchise Agreement, that plainly caused the Plaintiff to "sustain damages." See Wingate Inns Int'l, Inc. v. Universal Hosp. Sols., LLC, 750 F. Supp. 3d 422, 428 (D.N.J. 2024) ("[n]onpayment of money that is owed is damaging").

The real back-and-forth between the parties is as to the second element.

Namely, did the hotel operator "fail[] to perform a defined obligation" under the Franchise Agreement?

Out of the gate, the answer seems to be yes.

After all, the Franchise Agreement required the hotel operator to pay certain fees. See Franchise Agreement §§ 7, 11.1, 11.2.

And the hotel operator stopped paying them. See Mallet Affidavit, Exhibits D-L; see also Couch Certification, Exhibit B, at 44:11-24, 52:7 to 54:7, 59:9-16; id., Exhibit C, at 21:4 to 23:3.

But there is a wrinkle. Take it up just below.

### A.    "Continuously and Diligently"

Under Section 17 of the Franchise Agreement, the hotel operator's payment obligation was "excuse[d]" "if the failure to perform . . . results from . . . [a] fire[]." Franchise Agreement § 17.8.

And here, there was a serious one. See Defendants' Statement of Material Facts ¶ 80; Plaintiff's Response ¶ 80.

This would seem to excuse the nonpayment of fees by the hotel operator.

But as the Plaintiff points out, see Motion for Summary Judgment at 8-9, nonpayment is "excuse[d]" under Section 17 only "so long as a remedy is continuously and diligently sought by the affected party[.]" Franchise Agreement § 17.8.

That standard was not met here, the Plaintiff argues, and so it is entitled to summary judgment on its breach of contract claim.

5

The payments the hotel operator owed, the argument goes, were not properly "excuse[d]."

The Court's conclusion: this argument does not work, and the Plaintiff is therefore not entitled to summary judgment.

To see why, walk through the evidence as a reasonable jury[9] would be entitled to see it:

- In October 2019, there was a fire at the hotel.  See Defendants' Statement of Material Facts ¶ 80; Plaintiff's Response ¶ 80; Couch Certification, Exhibit B, at 36:18-22.  It put the hotel entirely out of business.  See Defendants' Statement of Material Facts ¶ 81; Plaintiff's Response ¶ 81; Couch Certification, Exhibit B, at 36:23 to 37:6.

- About a month after the fire, the hotel operator received notice that it was in default under the Franchise Agreement for nonpayment of fees, among other things. See Mallet Affidavit, Exhibits D-L; see also Couch Certification, Exhibit B, at 44:11-24, 52:7 to 54:7, 59:9-16; id., Exhibit C, at 21:4 to 23:3.

- During October 2019, an investigation by the insurance company got underway, and at some point that is not specified in the record, the hotel operator put in an insurance claim.  See Patel Affidavit (ECF 63-1) ¶¶ 9-10, 14.  The insurance company rejected it.  See Plaintiff's Statement of Material Facts (ECF 58-3) ¶ 63; Defendants' Response to Plaintiff's Statement of Material Facts (ECF 63-2) ¶ 63.

- In response to its claim being rejected, in April 2021 the hotel operator sued the insurer.  See Couch Certification, Exhibit B, at 43:20 to 44:4; Patel Affidavit ¶ 14; see also Acad. Bank, N.A. v. AmGuard Ins. Co., 2023 WL 2259166, at *2 (W.D. Mo. Jan. 26, 2023), aff'd, 116 F.4th 768 (8th Cir. 2024), reh'g denied, 2024 WL 4499662 (8th Cir. Oct. 16, 2024).

---

[9]  A "reasonable" jury because, on a summary judgment motion, "[p]art of a court's job . . . is to look ahead to the possibility of trial and ask whether a reasonable jury could find for the [nonmovants].  If yes, a trial must be greenlighted.  If no, there is no need for a trial --- and judgment can be entered[.]"  Mirena v. Exec. Jet Mgmt., Inc., 760 F. Supp. 3d 224, 231 (D.N.J. 2024).

- The hotel operator won after a jury trial, <u>see</u> <u>Acad.</u> <u>Bank, N.A.</u>, 2023 WL 2259166, at *2, but the insurer appealed, and the case was resolved in October 2024, essentially in favor of the hotel operator.  <u>See</u> <u>Acad.</u> <u>Bank</u>, 116 F.4th at 791.

Why does any of this matter?

Because a reasonable jury could conclude from the above that the hotel operator was "continuously and diligently" seeking a "remedy."  Franchise Agreement § 17.8.  And because it was, the hotel operator's nonpayment of fees was excused under Section 17 of the Franchise Agreement.  <u>See</u> <u>id</u>.

As to "continuously and diligently," the evidence above can be reasonably interpreted as showing that the hotel operator actively worked throughout the whole of the period from the fire (in October 2019) to the filing of this lawsuit (in February 2022) and beyond.  That time, a reasonable jury could conclude, was <u>used</u>.  It was spent in preparing and putting in an insurance claim.  And it was spent in filing and then pursuing a federal lawsuit when the insurance company did not make the requested payout.

Was all of that part of an effort to "remedy"[10] things?

Yes, a reasonable jury could conclude.

Pursuing insurance proceeds, through a claim and then a lawsuit, could allow the hotel operator to pay fees that it owed the Plaintiff.  This is common sense.  And putting hands on an insurance recovery could also get the hotel back up and running. That could spin off cash flow, and allow the hotel operator to pick back up in the future on paying Franchise Agreement fees.

---

[10]  A remedy is typically taken as a "correct[ion]."  <u>Remedy</u>, n., sense 2, <u>Merriam-Webster Collegiate Dictionary</u> (2025); <u>see</u> <u>also</u> <u>Remedy</u>, n., sense 3, <u>Collins English Dictionary</u> (2025); <u>Remedy</u>, n., <u>Cambridge English Dictionary</u> (2025); <u>see</u> <u>generally</u> <u>M.J. Paquet, Inc.</u> v. <u>N.J. Dep't of Transp.</u>, 171 N.J. 378, 396 (2002) (looking to dictionaries as to the plain meaning of undefined words in a contract); <u>Highland Lakes Country Club & Cmty. Ass'n</u> v. <u>Franzino</u>, 186 N.J. 99, 117–18 (2006) (same); <u>Serv. Armament Co.</u> v. <u>Hyland</u>, 70 N.J. 550, 556 (1976) (same).

See Patel Affidavit ¶ 16; Couch Certification, Exhibit B, at 37:2 to 38:16, 57:16 to 58:10, 79:8–14.[11]

In a nutshell:

The Plaintiff moves for summary judgment on Count III, and the basis for that claim is the hotel operator's nonpayment of Franchise Agreement fees.  See Motion for Summary Judgment at 5–6; Complaint ¶¶ 59–64.

But a reasonable jury could land on the conclusion that the nonpayment was excused under the Franchise Agreement.  Why? Because there was a fire.  And because the hotel operator was "continuously and diligently" seeking to "remedy" the operational and financial damage caused by the fire; throughout the relevant period, the hotel operator was busy, making an insurance claim and actively litigating against its insurer.

### B.   **The Counterargument**

Against the conclusion set out just above, the Plaintiff presses one main counterargument.

---

[11]  The Plaintiff seems to dispute, though sometimes implicitly, that the hotel operator planned to use insurance proceeds as a "remedy," as a way to get the hotel back up on its feet.  See Motion for Summary Judgment at 8; see also Couch Certification, Exhibit B, at 38:10 to 39:20.  And the record suggests room for doubt on that score.  After the fire, the hotel operator seems to have ignored the Plaintiff-franchisor for some period of time.  See Couch Certification, Exhibit A (email screenshots); id., Exhibit B, at 79:5 to 80:8.  Insurance proceeds could apparently be used to reopen the hotel only after certain other payments were made.  To a bank, for example, and to lawyers. See Couch Certification, Exhibit B, at 38:10 to 39:20, 57:23 to 58:10.  And moreover, post-fire vandalism had left the hotel in especially bad shape.  See id. at 57:1–14.  That would have made reopening a taller order yet.  See id. at 57:16–21.  But weighing evidence that pulls in different directions and deciding what is true --- that is not for a judge on summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Marino, 358 F.3d at 247.  On the Plaintiff's motion, the hotel operator is entitled to every reasonable inference from the evidence.  See Canada, 49 F.4th at 345; Tolan, 572 U.S. at 660.  And one reasonable inference here is that the hotel operator is gathering up insurance proceeds with an eye to reopening the hotel.

Namely: (1) the fire was arson caused by an agent of the hotel operator, see Motion for Summary Judgment at 6, and (2) the Franchise Agreement's "continuously and diligently" carve-out applies only to fires that were "beyond" the hotel operator's control --- and arson by the operator's agent is not that.  See id.

But this counterargument is not convincing.  To see why, take up each of its parts.

### 1.  Arson

As to the first part of the Plaintiff's counterargument, there is evidence on both sides of the ledger.

On the one hand, a hotel manager, see Couch Certification, Exhibit B, at 20:4-8, appeared to[12] have entered an Alford plea[13] to a charge of setting a fire at the hotel.  See ECF 66; see also Reply Brief (ECF 65) at 1.  But the transcript of the plea allocution has not been put before the Court.  And the plea agreement did not explicitly admit any arson; rather, it said: "I believe the state could prove I, along [with] others, knowingly damaged an inhabitable structure[.]"  ECF 66, Exhibit A at 5.[14]

On the other hand, the parties do not contest that the Court can take note of the jury's verdict after the above-referenced five-day federal insurance trial.  See Opposition Brief (ECF 63) at 9-10.  And that jury verdict does not seem to imply that it was

---

[12]  "Appeared to" because the plea agreement includes some potentially significant writing that seems to have been crossed out.  See ECF 66, Exhibit A at 5.

[13]  "An Alford plea generally refers to a guilty plea entered by a defendant who wishes to expressly maintain his innocence." United States v. McGill, 128 F. Supp. 3d 863, 869 (E.D. Pa. 2015); see generally North Carolina v. Alford, 400 U.S. 25 (1970).

[14]  For present purposes, the Court assumes arguendo that the Alford plea here would be admissible.  A nolo contendre plea is not generally admissible.  See Fed. R. Evid. 410(a)(2).  As to whether the plea here amounted in practice to an Alford plea or a nolo plea, the Court expresses no opinion for now, in part because without reviewing the plea allocution transcript there is no reliable way to tell.

the hotel manager who committed arson.  See Acad. Bank, N.A., 2023 WL 2259166, at *7-8.

There is, in short, a large gulf between how the Plaintiff sees the evidence (emphasizing the criminal Alford plea) and how the hotel operator sees it (emphasizing the civil jury verdict).

Choosing between these accounts of the evidence is for a jury at trial.  Not for taking away from a jury, by the Court entering summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Nathanson v. Med. Coll. of Pa., 926 F.2d 1368, 1380 (3d Cir. 1991); see also 18W Holdings, Inc. v. Sing for Serv., LLC, 763 F. Supp. 3d 651, 663 (D.N.J. 2025); Dejewski v. Nat'l Beverage Corp., 735 F. Supp. 3d 511, 524 (D.N.J. 2024).

## 2.  **The Franchise Agreement**

As to the second part of the Plaintiff's counterargument, it rests on the premise that Section 17 of the Franchise Agreement excuses only those breaches of contract that flow from causes that are "beyond the [affected party's] control."  See Motion for Summary Judgment at 8 (citing Franchise Agreement § 17.8).

A fire started by an agent of the hotel operator would plainly not be that.  Quite the opposite.  It would be within the control of the hotel operator, not "beyond" it.

But the premise of the Plaintiff's counterargument argument is not solid.[15]

---

[15]  An important point.  There is a long history of courts declining to allow parties to a contract to benefit from their own serious wrongdoing.  See generally Ford v. Ford, 307 Md. 105 (1986) (discussing the slayer rule).  These arguments typically sound in equity.  See, e.g., Liu v. SEC, 591 U.S. 71, 79-80 (2020); Root v. Ry. Co., 105 U.S. 189, 207 (1882); Reynolds v. United States, 98 U.S. 145, 159 (1879); Neiman v. Hurff, 11 N.J. 55, 60 (1952).  If the hotel operator's agent provably committed arson, would New Jersey law permit the operator to avoid making contractual payments on that basis?  That question has not been put before the Court.  The Plaintiff makes no argument along those lines.  The Plaintiff does not argue from equity, or from a variant on the slayer rule that might potentially be on the table here.  Rather, its argument is based entirely on its interpretation of Section 17.  See Motion for Summary Judgment at 5-9.  The Court addresses the argument the Plaintiff has made, not other arguments it might have opted for.  See Wu v.

Start to see the point by zooming out and looking at the key part of Section 17:

> Neither you nor we shall be liable for loss or damage or deemed to be in breach of this [Franchise] Agreement if the failure to perform obligations results from (a) windstorms, rains, floods, earthquakes, typhoons, mudslides or other similar natural causes (b) fires, strikes, embargoes, war, acts of terrorism, or riot, (c) legal restrictions that prohibit or prevent performance, or  (d) any other similar event or cause beyond the control of the party affected.

Franchise Agreement § 17.8.

The Plaintiff's contention seems to be that the words at the end of (d) --- "beyond the control of the party affected" --- have a backward-running effect, and modify the various words in (a), (b), and (c), including "fire[]."

A fire, on this reading, can excuse nonperformance.  But only if it was a fire "beyond the control of the party affected," the hotel operator.

It is not clear, though, that this is the right way to read Section 17.

To unpack the point, note a bedrock interpretive principle.

Namely: when there is a limiting clause (here, "beyond the control of the party affected") that comes at the end of a list (here, at the end of the (a)-(b)-(c)-(d) list), the limiting clause is not taken as running fully backwards and casting its limit back over the whole list.  Rather, the limiting clause is understood to limit only what comes just before it.

As to Section 17, that would mean that "beyond the control of the party affected" limits "any other similar event or cause" --- but not all of the other previous words in the Section, like "fire[]" (in (b)) or "earthquake[]" or "typhoon[]" (in (a)).

---

GSX Techedu Inc., 738 F. Supp. 3d 527, 559-60 (D.N.J. 2024) (discussing the party-presentation principle).

The rule described in the preceding paragraphs is called the last antecedent rule.[16]

It is a basic part of our law.  It has been relied on for hundreds of years.  The Supreme Court of the United States, for example, has applied it in <u>Lockhart</u> v. <u>United States</u>, 577 U.S. 347, 351 (2016), <u>FTC</u> v. <u>Mandel Brothers, Inc.</u>, 359 U.S. 385, 389 (1959), and <u>Sims' Lessee</u> v. <u>Irvine</u>, 3 U.S. (3 Dall.) 425, 444 n*. (1799).  And the Supreme Court of New Jersey applied it in <u>State</u> v. <u>Gelman</u>, 195 N.J. 475, 484 (2008).[17]

---

[16]  To see an example of the last antecedent rule in action, think through this sentence: "next weekend, he will juggle and run in a marathon."  Most English speakers would not take this to mean that the person in question plans to "juggle . . . in a marathon."  Part of why is a common sense understanding of what the quoted words likely point to out in the world.  Juggling while running in a marathon is sometimes done.  But it is highly unusual, a novelty.  This said, sentence structure is part of what clears things up, too.  And that is where the last antecedent rule comes into play.  The limiting clause ("in a marathon") is understood to modify the term just before it ("run").  But it is not understood to reach back to the beginning of the sentence ("juggle").

[17]  The most familiar context for applying the last antecedent rule is when the text to be interpreted is a statute.  <u>See</u>, <u>e.g.</u>, <u>Lockhart</u>, 577 U.S. at 351; <u>Barnhart</u> v. <u>Thomas</u>, 540 U.S. 20, 26 (2003); <u>Gelman</u>, 195 N.J. at 484.  And the text here is not a statute, but a contract.  No matter.  The last antecedent rule is based on an understanding of how English typically works.  It is not rooted in any "substantive" policy-type concerns that are particular to interpreting statutes, and that therefore may not translate well into other areas, as when what is being interpreted is a contract.  So there is no reason to cabin the last antecedent rule, to apply it only to statutory interpretation, but not to contractual interpretation.  <u>See generally</u> Amy Coney Barrett, <u>Substantive Canons and Faithful Agency</u>, 90 B.U. L. Rev. 109, 117 (2010) (distinguishing between two types of canons, linguistic and "substantive"); <u>see also</u> Caleb Nelson, <u>Statutory Interpretation and Decision Theory</u>, 74 U. Chi. L. Rev. 329, 356 (2007) (similar).  And note: when it comes to interpretive canons like the last antecedent rule, that

In short: the last antecedent rule is often applied to sentences structured like Section 17 of the Franchise Agreement, and in keeping with the rule, it is not clear that "beyond the control of the party affected" runs back to modify "fire," as the Plaintiff argues that it does.

And go further: the case for applying the last antecedent rule to Section 17 is especially strong in this particular case.

Take four reasons why.

*     *     *

First, the relevant part of Section 17, set out above in the block quote, is long. For the end-of-the-line limiting clause ("beyond the control of the party affected") to reverse course and modify "fire," it would need to reach back more than 30 words.

But modifiers are usually taken to modify nearby words, not distant ones. See Chicago Manual of Style ¶¶ 5.174, 5.182 (18th ed. 2024); Geoffrey N. Leech, Introducing English Grammar 91, 93 (1992) (describing the placement of "postmodifiers" and "prepositional phrases"); George O. Curme, English Grammar 171 (1947).

Second, "beyond the control of the party affected" sits in its own labeled Section 17 subclause --- (d), along with the words "any other similar event or cause." It is natural to read the two bits of text in (d) ("beyond the control of the party affected" and "any other similar event or cause") as bundled together.

---

are based on intuitions as to how English generally works, New Jersey courts routinely apply those across the board, to the interpretation of both statutes and contracts. For New Jersey cases applying familiar statutory interpretation canons to interpretation of contracts, see, for example, Yalango v. Yalango, 2021 WL 416425, at *2-3 (N.J. Super. Ct. App. Div. Feb. 8, 2021) (last antecedent rule); Isetts v. Borough of Roseland, 364 N.J. Super. 247, 257 (App. Div. 2003) (noscitur a sociis); Gabel v. Manetto, 177 N.J. Super. 460, 464 (App. Div. 1981) (expressio unius); Seitz v. Mark-O-Lite Sign Contractors, Inc., 210 N.J. Super. 646, 650 (Law Div. 1986) (ejusdem generis).

And that weakens the suggestion that (d) can be cleaved apart, such that "beyond the control of the party affected" can be treated as a free-floating modifier --- one that impacts how to read not only what it is yoked to ("any other similar event or cause"), but also earlier words like "fire[]" and "earthquake[]" and "typhoon[]."

Third, look to context.

If "beyond the control of the party affected" snakes back to modify "fire," that makes real-world sense.

A rampaging wildfire excuses nonperformance because it is "beyond the control of the party affected."  By contrast, arson might not excuse nonperformance when it is within "the control of the party affected."

But if "beyond the control of the party affected" backtracks to modify "fire," then it must also loop back to modify "earthquakes," and "windstorms, rains, . . . [and] typhoons[.]"

But that would make little sense.[18]

All earthquakes and all typhoons are "beyond the control of the party affected."

Why would the Franchise Agreement rely on a modifier phrase ("beyond the control of the party affected") that does not modify a category, but rather points to everything in it?

And along the same lines: how can there be a need for a modifier that differentiates between (a) those "embargoes" and "war[s]" that are "beyond the control" of a hotel franchisee and (b) those that are within its control?  All embargoes and wars are beyond a given hotel franchisee's control.  Not some.

Fourth, focus on the need to avoid readings that spin off redundancy or incoherence.  See generally Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 103-04 (2009); Chelsea-Wheeler Coal Co. v. Marvin, 33 Backes 432, 437 (N.J. 1944); Focazio v. Aboyoun, 481 N.J. Super. 153, 166 (App. Div. 2025).

---

[18]  See generally Barila v. Bd. of Educ. of Cliffside Park, 241 N.J. 595, 616 (2020) (describing the New Jersey law preference for avoiding absurd interpretations); Quinn v. Quinn, 225 N.J. 34, 45 (2016) (same); Sachau v. Sachau, 206 N.J. 1, 5-6 (2011) (same).

Per subclause (a) of Section 17, performance can be excused by "windstorms, rains, floods, earthquakes, typhoons, mudslides <u>or other similar causes</u>."  Franchise Agreement § 17.8(a) (emphasis added).

And on the Plaintiff's interpretation, the last part of (d) ("any other similar . . . cause[s]") should be read back into (a), which <u>also</u> references "similar . . . causes."

But what sense would it make for the "similar causes" of (a) to be then modified by the "similar cause[s]" of (d)?

Under (a), performance is explicitly excused when there is something "similar" to a windstorm.

But on the Plaintiff's interpretation, (a) is then modified by (d) --- and performance is <u>also</u> excused when there is something similar (under (d)) to something similar to a windstorm (under (a)).

It is hard to understand what might be similar to something similar to a windstorm.  And it is harder yet to know why Section 17 should be read to cover whatever that is.

But that doubling-up is an implication of the Plaintiff's (d)-modifies-(a) interpretation of the Franchise Agreement.  And it is one more reason to doubt that the Plaintiff's interpretation is the right one.[19]

---

[19]  In spite of the Court's current doubt, might the Plaintiff's read of Section 17 <u>ultimately</u> prove to be the right one?  Maybe. There are, for example, contexts in which the last antecedent rule is not applied.  And in those circumstances, a limiting clause is taken to modify each part of a list, not just the last piece of it.  <u>See</u> <u>Lockhart</u>, 577 U.S. at 355 (discussing the series-qualifier canon); <u>id.</u> at 364-65 (Kagan, J., dissenting) (same); <u>Matter of Proposed Constr. of Compressor Station (CS327)</u>, 258 N.J. 312, 330-31 (2024) (same); <u>see also</u> <u>Chicago Manual of Style</u> ¶ 5.185; Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 147 (2012).  But to get summary judgment the Plaintiff must affirmatively show that it is entitled to judgment as a matter of law.  <u>See</u> <u>Cellco P'ship</u>, 74 F.4th at 100; <u>Howard Hess Dental Lab'ys Inc.</u> v. <u>Dentsply Int'l, Inc.</u>, 602 F.3d 237, 251 (3d Cir. 2010); <u>see also</u> Fed. R. Civ. P. 56(a).  And for the reasons described in the text, it is not possible at this point to say that the Plaintiff

C.    <u>**Conclusion**</u>

Where things stand.

The Plaintiff is not entitled to summary judgment as to Count III, which is based on the hotel operator's nonpayment of fees.

The reason why: a reasonable jury could conclude that the hotel operator was excused from paying fees because it was working "continuously and diligently" to "remedy" the damage from a fire.  <u>See</u> Part II.A.

The Plaintiff has a two-part counterargument to this, but it is not persuasive.

As to its first part, the Court cannot conclude as a matter of law that the hotel operator's agent used arson to burn the hotel.  <u>See</u> Part II.B.1.  That is the jury's call to make.

And as to its second part, it is not clear that the Plaintiff's read of Section 17 of the Franchise Agreement is convincing. <u>See</u> Part II.B.2.

In light of the above, the Plaintiff's Count III summary judgment motion must be denied.

And so too the Court must deny the Plaintiff's other breach-of-contract-related summary judgment motions.

Summary judgment on the Plaintiff's motion as to the Count VII claim against the guarantor, <u>see</u> Motion for Summary Judgment at 10-12, must be denied because the Court has not held as a matter of law that there <u>was</u> a breach.  So the guarantor had no obligation to step up, at least as things stand now.

And summary judgment on the Plaintiff's motion for liquidated damages for breach of contract, <u>see</u> <u>id</u>. at 2, 5-9, must also be

---

has shown that its interpretation of the Franchise Agreement is the correct one.  (And note that if the analysis in the text were taken to suggest only that the Franchise Agreement is ambiguous, then that would weigh here against the Plaintiff's approach.  <u>Compare</u>, <u>e.g.</u>, <u>Pacifico</u> v. <u>Pacifico</u>, 190 N.J. 258, 267 (2007) (ambiguity is held against the drafter), <u>with</u> Jones Declaration, Exhibit 1 (ECF 63-3) at 8:20-23 (suggesting the Plaintiff drafted the Franchise Agreement).)

denied.  Damages can be awarded only when there has been a legal determination that a party is liable.  No such determination has been made here.[20]

## III. **Trademark**

Move now from the Plaintiff's breach of contract claims to its motion for summary judgment as to Count One.

Count One brings together three trademark infringement and dilution claims.  These are under 15 U.S.C. §§ 1114(1)(a), 1125(a)(1), and 1125(c).

The core of the Plaintiff's Count One claim:

After the 2019 fire, the hotel never reopened, see Defendants' Statement of Material Facts ¶¶ 80-81; Plaintiff's Response ¶¶ 80-81, and in 2022, the Franchise Agreement was terminated. See Mallet Affidavit, Exhibit L.  But the old hotel sign included the Plaintiff's trademark, and it was not taken down until 2023, based on an order issued by this Court.  See Permanent Injunction by Consent (Oct. 31, 2023) (ECF 44).

As to Count One, is the Plaintiff "entitled to judgment as a matter of law?"  Fed. R. Civ. P. 56(a).

The Court's conclusion: no.

This is because, under somewhat different verbal formulations, each of the cited statutes requires proof that the trademark in

---

[20]  Two things here.  First, the record suggests that there might have been other bases for liability (and therefore, liquidated damages) --- including some that were enumerated in the Plaintiff's termination letter of March 31, 2022.  See Mallet Affidavit, Exhibit  L (citing id., Exhibits D-K).  The Plaintiff makes a passing reference to these other bases for liability for the first time in its reply brief.  See Reply Brief at 2.  But "arguments raised in passing . . . but not squarely argued[] are considered waived."  John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1076 n.6 (3d Cir. 1997).  And all the more so when pressed for the first time in a reply brief.  Second, the parties go back and forth in their papers as to whether Section 11.3.1 of the Franchise Agreement waives liquidated damages.  See Motion for Summary Judgment at 6-8; Opposition Brief at 6, 19.  But because the Court resolves the summary judgment motion as to liquidated damages on other grounds, it does not take up that Section 11 argument here.

question was being used commercially.  But that was not the case here.  The sign with the trademark was simply hanging outside an empty and nonoperational hotel building.  It had no plausible commercial purpose --- and was not being "used" in any meaningful sense.

### A.    __The Statutes__

The stepping-off point here is analysis of the various statutes cited in Count One.

Section 1114(1)(a), with emphasis added:

> Any person who shall, without the consent of the registrant use in commerce any reproduction . . . of a registered mark in connection with the sale, offering for sale . . . or advertising of any goods or services on or in connection with which such use is likely to cause confusion . . . shall be liable[.]

Section 1125(a)(1)(A), also with emphasis added:

> Any person who, on or in connection with any goods or services . . . uses in commerce. . . any false designation of origin . . . which . . . is likely to cause confusion . . . as to the origin . . . of his or her goods, services, or commercial activities . . . shall be liable[.]

And finally, per Section 1125(c)(1), with emphasis added, a person may be liable

> who . . . commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark[.]

"[W]hen the statutory language is plain," the statute "must [be] enforce[d] according to its terms."  Jimenez v. Quarterman, 555 U.S. 113, 118 (2009); accord Dodd v. United States, 545 U.S. 353, 359 (2005).

Here, the language Congress chose is straightforward.

All three of the statutes require "use" of a trademark "in commerce."

But a hotel sign sitting outside a burnt-out hotel is not being "used," let alone "in commerce." After the hotel fire in 2019, there was no "commerce" being done. No one was looking at the sign and deciding whether to check in, because the hotel was closed.[21]

Two of the statutes (Sections 1114(1)(a) and 1125(a)(1)) require "use" "in connection with any goods or services."[22]

As to those, same point.

A sign, as left up outside an unoccupied hotel, is not being "use[d]" in any meaningful sense. And it is certainly not being "use[d]" "in connection with any . . . services," because with the hotel abandoned and burnt-out --- no services were being offered.

In short: the language of the statutes cited by the Plaintiff suggests that its Count One claim cannot go forward.

Caselaw, as noted in the next section, points in the same direction.

---

[21]  For the meaning of a statutory term, courts routinely look to time-of-enactment dictionaries. See Sandifer v. U.S. Steel Corp., 571 U.S. 220, 227–28 (2014). At the time of the enactment of Sections 1114 and 1125(a) in 1946, "commerce" meant "[b]usiness intercourse," such as "the exchange or buying and selling of commodities[.]" Commerce, n., sense 1, Webster's Collegiate Dictionary 201 (5th ed. 1945); see also Commerce, n., sense 1, Webster's New Standard Dictionary of the English Language 107 (1946); Commerce, n., Pocket Oxford Dictionary of Current English 153 (4th ed. 1942). That did not shift in 2006 when Section 1125(c) was added. See Commerce, Black's Law Dictionary (8th ed. 2004); Commerce, n., sense 2, Merriam-Webster's Collegiate Dictionary 249 (11th ed. 2006); Commerce, n., Oxford Dictionary of American English 132 (2005); Commerce, n., sense 1, Collins English Dictionary 341 (7th ed. 2005).

[22] Section 1125(a)(1) is quoted in the text. Section 1114(1)(a) is very close to a carbon copy of Section 1125(a)(1), but not quite.

**B.    <u>The Cases</u>**

While the Third Circuit has not weighed in, various courts of appeals have interpreted the statutory sections cited by the Plaintiff as generally requiring use of the relevant trademark in commerce.

Walk through some of these cases here.

The Second Circuit, as to two of the parts of the Lanham Act cited by the Plaintiff, Sections 1114(1)(a) and 1125(a)(1):

> A company's internal utilization of a trademark in a way that does not communicate it to the public is analogous to a[n] individual's private thoughts about a trademark.  Such conduct simply does not violate the Lanham Act, which is concerned with the use of trademarks in connection with the sale of goods or services in a manner likely to lead to consumer confusion as to the source of such goods or services. <u>See</u> 15 U.S.C. § 1127; <u>see also</u> Louis Altman, 4 <u>Callmann on Unfair Competition, Trademarks and Monopolies</u> § 22:25 n.1 (4th ed. 2004) ("A fortiori, a defendant who does not sell, but merely uses internally within his own company, the trademarked product of another, is not a trademark infringer or unfair competitor by virtue of such use.").

<u>1-800 Contacts, Inc.</u> v. <u>WhenU.Com, Inc.</u>, 414 F.3d 400, 409 (2d Cir. 2005).

The Ninth Circuit on Sections 1114(1)(a) and 1125(a)(1) of the Lanham Act, cited by the Plaintiff:

> The Supreme Court has made it clear that trademark infringement law prevents only unauthorized uses of a trademark in connection with a commercial transaction in which the trademark is being used to confuse potential consumers.  <u>See</u> <u>Prestonettes, Inc.</u> v. <u>Coty</u>, 264 U.S. 359, 368 (1924) ("A trade-mark only gives the right to prohibit the use of it so far as to protect the owner's good will against <u>the sale of another's</u>

> product as his."); see also Mishawaka Rubber
> & Woolen Mfg. Co. v. S.S. Kresge Co., 316
> U.S. 203, 205 (1942) (explaining that the
> main purpose of the Lanham Act is to prevent
> the use of identical or similar marks in a
> way that confuses the public about the
> actual source of goods and services).
>
> As the Second Circuit held, "[t]he Lanham
> Act seeks to prevent consumer confusion that
> enables a seller to pass off his goods as
> the goods of another. . . . [T]rademark
> infringement protects only against mistaken
> purchasing decisions and not against
> confusion generally." Lang v. Ret. Living
> Publ'g Co., Inc., 949 F.2d 576, 582–83 (2d
> Cir. 1991).

Bosley Med. Inst., Inc. v. Kremer, 403 F.3d 672, 676–77 (9th
Cir. 2005) (cleaned up).

The Ninth Circuit again, focusing on Section 1125(c), a part of
the Lanham Act cited here by the Plaintiff:

> We are also satisfied that the [use] amounts
> to a "commercial use in commerce." [23]

---

23 Section 1125(c) was amended in 2006. See Trademark Dilution
Revision Act of 2006, Pub. L. No. 109-312, 120 Stat. 1730.
Before, Section 1125(c) prohibited the "commercial use in
commerce of a [famous] mark." 15 U.S.C. § 1125(c) (2005).
After 2006, the statute was revised and "commercial" was
removed; the stature now focuses on "use of a [famous] mark
. . . in commerce." 15 U.S.C. § 1125(c) (2025). But that has
not changed the picture. The caselaw from before and after the
2006 amendment is consistent --- active "use" of the trademark
"in commerce" is required. Compare Times Mirror Magazines, Inc.
v. Las Vegas Sports News, L.L.C., 212 F.3d 157, 163 (3d Cir.
2000) (applying pre-2006 version of Section 1125(c)), Savin
Corp. v. Savin Grp., 391 F.3d 439, 448–49 (2d Cir. 2004) (same),
Mattel, Inc. v. MCA Recs., Inc., 296 F.3d 894, 903 (9th Cir.
2002) (same), Bird v. Parsons, 289 F.3d 865, 879 (6th Cir. 2002)
(same), Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 215 (2d
Cir. 1999) (same), abrogated by Moseley v. V Secret Catalogue,
Inc., 537 U.S. 418 (2003) (same), and Bosley, 403 F.3d at 676
(same), with Cintas Corp. v. Unite Here, 355 F. App'x 508, 510–

> Although this statutory language is
> ungainly, its meaning seems clear: It refers
> to a use of a famous and distinctive mark to
> sell goods other than those produced or
> authorized by the mark's owner.

Mattel, Inc. v. MCA Recs., Inc., 296 F.3d 894, 903 (9th Cir. 2002).

The Sixth Circuit on Section 1125(c):

> One of the elements of a claim of dilution
> is that the alleged diluter, the junior
> user, engage in "the commercial use in
> commerce" of the diluting trademark.
> Kellogg Co. v. Exxon Corp., 209 F.3d 562,
> 577 (6th Cir. 2000) (noting that "the junior
> use must be a commercial use in commerce")
> (citation omitted); 15 U.S.C. § 1125(c)
> ("The owner of a famous mark shall be
> entitled . . . to an injunction against
> another person's commercial use in commerce
> of a mark or trade name . . .").  Commercial
> use occurs where the alleged diluter uses
> "the trademark as a trademark, capitalizing
> on its trademark status."  Avery Dennison
> Corp. v. Sumpton, 189 F.3d 868, 880 (9th
> Cir. 1999).

Bird v. Parsons, 289 F.3d 865, 879 (6th Cir. 2002).

---

11 (2d Cir. 2009) (applying post-2006 version of Section 1125(c)), Perfumebay.com Inc. v. eBay, Inc., 506 F.3d 1165, 1180 (9th Cir. 2007) (same),  Harp v. Rahme, 984 F. Supp. 2d 398, 421 (E.D. Pa. 2013) (same), and CPC Props., Inc. v. Dominic, Inc., 2013 WL 4457338, at *5 (E.D. Pa. Aug. 21, 2013) (same).

Other cases,[24] and leading treatises,[25] land in roughly the same place: use of a trademark in commerce (or in connection with services) is required for liability under the statues invoked by the Plaintiff.

And as noted above, see Part III.A, a sign left hanging outside a non-working hotel does not make the cut.

The close-to-the-ground cases confirm that conclusion. Look to a few of them just below.

\*    \*    \*

Start with Howard Johnson International, Inc. v. Vraj Brig, LLC, 2010 WL 215381 (D.N.J. Jan. 14, 2010).

There, the plaintiff, a hotel franchisor, sued a former franchisee. See id. at *1. The agreement between them had been terminated. See id. The hotel had closed. See id. But there was still a billboard up on the property that showed the franchisor-plaintiff's trademark. See id. at *2.

The court held that there was no violation under Sections 1114, 1125(a), and 1125(c), because the franchisee-defendant was not "mak[ing] use of the mark," and there was no "connection to goods or services." Id. at *6 (cleaned up).

To be sure, "any individual travelling down the highway who sees the [franchisor-plaintiff's] sign over the lodging facility . . . and then fails to find such a hotel will experience feelings of frustration that will tarnish his or her impression of [the franchisor-plaintiff]" --- but no matter, the court held. See id. at *7. Trademark law focuses on "the defendant's

---

[24] As to Sections 1114(1)(a) and 1125(a)(1), see, for example: Jekyll Island-State Park Auth. v. Polygroup Macau Ltd., 140 F.4th 1304, 1327 (11th Cir. 2025); Hetronic Int'l, Inc. v. Hetronic Germany GmbH, 99 F.4th 1150, 1162-63 (10th Cir. 2024); Shingle Springs Band of Miwok Indians v. Caballero, 630 F. App'x 708, 711 (9th Cir. 2015); Kelly-Brown v. Winfrey, 717 F.3d 295, 305-06 (2d Cir. 2013). And as to Section 1125(c), see, for example: Bosley, 403 F.3d at 676; TMI, Inc. v. Maxwell, 368 F.3d 433, 436 (5th Cir. 2004); Savin Corp., 391 F.3d at 449.

[25] See, e.g., 3 McCarthy on Trademarks and Unfair Competition §§ 25:53, 25:54, 25A:42 (5th ed. 2025); 1A Gilson on Trademarks § 3.03 (2025).

offer of goods or services, not the <u>plaintiff's</u> offer [of] goods or services."  <u>Id</u>. (emphasis in original and emphasis added).

*    *    *

A second example: <u>Renna</u> v. <u>County of Union</u>, 88 F. Supp. 3d 310 (D.N.J. 2014).

A county government sued the host of a TV show.  <u>See id</u>. at 311-12.  The show often criticized the local government; and in doing so, it sometimes displayed the county seal.  <u>See id</u>. at 312.

The court concluded that there was no trademark infringement, because the seal was used as part of the host's "political expression."  <u>Id</u>. at 323.  And political expression is not typically a concern of trademark law, which is focused on the "use of a mark in connection with the furnishing of goods or services."  <u>See id</u>. at 322 (cleaned up).

*    *    *

And a third example: <u>Learning Experience Systems, LLC</u> v. <u>Foxborough Child Care, LLC</u>, 2010 WL 3565712 (S.D. Fla. Aug. 19, 2010), <u>report and recommendation adopted</u>, 2010 WL 3565708 (S.D. Fla. Sept. 9, 2010).

There, a franchisor of daycare centers sued a former franchisee. <u>See id</u>. at *1.  The franchisee had bank accounts whose name seemingly referenced the franchisor-plaintiff's trademark.  <u>See id</u>. at *7.

On a preliminary injunction motion, the court found that the franchisor-plaintiff was not substantially likely to win on its trademark infringement claim, which was based on its trademark's association with the bank account.  Why not?  The plaintiff "ha[d] not shown that [the franchisee-defendants] . . . used [the] [p]laintiff's mark in connection with the sale or advertisement of [the] [p]laintiff's services."  <u>Id</u>.

*    *    *

The above three cases, each in different ways, require what is missing here: <u>use</u> of the Plaintiff's trademark, and in a way that is connected in some way to commerce.[26]

---

[26]  And for other cases that embrace the same basic idea: <u>Wakefern Food Corp.</u> v. <u>Marchese</u>, 2021 WL 3783259, at *3-4

24

\*      \*      \*

Bottom line: the Plaintiff's summary judgment motion is denied as to its Count I trademark claims.

## IV.    Conclusion

The motion for summary judgment as to Counts I, III, V, and VII is denied.

IT IS on this 14th day of July, 2025, so **ORDERED**.

_____
Michael E. Farbiarz, U.S.D.J.

_____

(D.N.J. Aug. 26, 2021) (trademark used during a conversation with a real estate broker); Zany Toys, LLC v. Pearl Enters., LLC, 2014 WL 2168415, at \*9 (D.N.J. May 23, 2014) (trademark might have been used on a trademark registration application but not in commerce); Cellco P'ship v. Commc'n Workers of Am., 2003 WL 25888375, at \*4-5 (D.N.J. Dec. 11, 2003) (trademark was used on advertisements for a labor dispute).  The Plaintiff cites one decision that goes the other way: Howard Johnson Int'l, Inc. v. Holeyfield, No. 03-cv-000418 (D.N.J. July 6, 2004).  See Motion for Summary Judgment at 16.  But given the plain meaning of the statutes, see Part III.A, and the weight of authority gathered here, the Court declines to adopt the reasoning of that decision.